1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
**For the Northern District of California**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

E.K. WADE,

        Plaintiff,

  v.

HILDA L. SOLIS, SECRETARY OF LABOR,

        Defendant.

_____/

Consolidated Case No. C-08-00001  EDL

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

      This action is one in a series of actions filed by plaintiff, E.K. Wade, ("Wade" or "Plaintiff") alleging discrimination in employment.  Wade claims that during his tenure with the defendant U.S. Department of Labor, Office of Federal Contract Compliance Programs, Pacific Region, ("OFCCP" or "Defendant"), he was discriminated against in his employment based upon race, age, and disability.

      Defendant argues that it is entitled to summary judgment on all of Wade's claims for several reasons.  First, Wade cannot establish a prima facie case of employment discrimination.  Second, Wade cannot show that Defendant had a discriminatory or retaliatory motive in any of the adverse employment actions that Plaintiff complains about; rather, according to Defendant, each action was supported by a legitimate non-discriminatory reason.  Third, Wade has not established facts that show a hostile work environment or constructive discharge.  Fourth, Wade has not established that he was entitled to any reasonable accommodation let alone the accommodation sought, which was transfer to another supervisor.  The Court held a hearing on Defendant's motion on April 28, 2009.  For the following reasons, and for the reasons stated at the hearing, the Court grants Defendant's motion.

**United States District Court**
For the Northern District of California

1    **I.      FACTS**

2           **A.      Procedural Background**

3           Defendant previously filed a motion to dismiss Wade's Fourth Amended Complaint in

4    related case No. 06-4725 MJJ. Brown Decl at ¶11.  Prior to a ruling on the motion to dismiss, the

5    parties agreed to dismiss the Fourth Amended Complaint without prejudice, so Wade could file a

6    new complaint to allege facts related to exhaustion.  Id.  On January 3 and 4, 2008, Wade filed two

7    new complaints based upon the same facts and circumstances.  The later filed complaint is the

8    operative complaint in this action, and was asserted against the U.S. Department of Labor ("DOL").

9    The other complaint was asserted against ten of Wade's co-workers, Elaine Chao and Charles James,

10   the Deputy Assistant Secretary of OFCCP, in their individual capacities. On May 13, 2008, the

11   Court granted Defendant's motion to dismiss Wade's entire action against the individual defendants,

12   and Wade's seventh and eighth claims in this action.  See Docket No. 53.

13          **B.      Factual Background**

14          Wade is an African-American man, who was born in 1947.  Brown Decl., Ex. A ("Wade

15   Depo.") at 14:18-19.  Wade is a Vietnam veteran, who claims to suffer from Posttraumatic Stress

16   Disorder ("PTSD").  Wade Depo at 17:16-20, 92:16-18.  Wade does not claim to suffer from any

17   other disability.  Id. at 92:16-20.  Although Wade claims to suffer from PTSD, recent psychiatric

18   testing did not reveal any signs of PTSD.  Brown Decl at ¶8, Ex G at 8-9.  Wade, however, has

19   submitted medical documentation from January 2006 revealing a history of PTSD.[1]  See Pl. Tab A at

20   32.  Wade began working at OFCCP, as a Compliance Officer/Equal Opportunity Specialist ("CO")

21   on September 26, 2000. Wade Depo. at 18:11-14; 19:5-8.  He was employed by OFCCP until

22   October 11, 2004.  Id.

23          **C.      Undisputed Facts Regarding Wade's Claims**

24          Wade alleges that he experienced numerous adverse actions because of his race, age, and

25

26           [1] Defendant objected to this exhibit, arguing that it is incomplete, that Plaintiff's authenticating
     declaration is untimely, that Plaintiff's medical doctor was not disclosed as an expert, and that the report
27   itself was not disclosed in discovery.  Given Plaintiff's pro se status, the Court assumes for the purposes
     of summary judgment that Plaintiff has a history of PTSD as described in this medical report.  However,
28   as Plaintiff noted at the hearing, it is undisputed that Defendant did not have notice of this report until
     after Plaintiff resigned.

United States District Court
For the Northern District of California

1 disability. Wade claims that he was: 1) forced to move to another cubicle with his back to other

2 COs; 2) denied a timely promotion to the position of Compliance Officer GS-11 in retaliation for

3 whistle blowing; 3) denied "formal" off-site systemic discrimination training; 4) denied his request

4 to transfer from one supervisor to another supervisor in the Oakland OFCCP office; 5) sent to Reno,

5 Nevada, in retaliation for filing a union grievance; 6) denied promotion to GS-12; 7) denied 160

6 hours of advanced sick leave; and 8) denied workers' compensation benefits. See e.g., Wade Depo

7 at 157:5-13; 162:9-14, 135:2-10. He claims these actions were taken by a collection of management

8 personnel, of whom the primary actors were Georgia Martin, his immediate supervisor; William

9 Smitherman, then the Deputy Regional Director; Woodrow Gilliland the Regional Director; and

10 Alice Young, a supervisor. Wade Depo at 147:13-20.

11         1.     OFCCP And The Position Of Compliance Officer

12      The OFCCP is an agency that investigates federal contractors to ensure compliance with the

13 affirmative action and systemic discrimination regulations. The agency also investigates complaints

14 made by individuals regarding the same. There are ten OFCCP Regional Offices in the United

15 States. A CO must demonstrate the ability to identify, appropriately analyze, and remedy systemic

16 discrimination, if found. Declaration of William Smitherman ("Smitherman Decl") at ¶2 & Ex. A at

17 03296. COs are required to make on-site visits to government contractors and to investigate

18 allegations of discrimination, as well as assess a contractor's compliance with the law. Accordingly,

19 CO's must have the ability to interact with others in a professional manner. Id. When Wade joined

20 the Oakland office there were thirteen COs. Id. at ¶3. All with the exception of two had reached the

21 GS-12 level prior to Wade's arrival. The two remaining COs were GS-11s upon Wade's arrival, and

22 both were promoted to GS-12 during his tenure. Id.

23         2.     Wade's First Altercation With A Co-Worker

24      Soon after beginning his employment with OFCCP, in July 2001, Wade engaged in an

25 altercation with one of his co-workers, Arlene Chang, an Asian American female. Declaration of

26 Georgia Martin ("Martin Decl") at ¶10; Wade Depo. at 72:7-73:1 (describing telling Ms. Chang not

27 to "say a God damned thing to me anymore"). When Wade first began working for OFCCP, Ms.

28 Chang offered him "mentoring" and guidance on his cases. Wade Depo. at 68:14-23. However, at

**United States District Court**
For the Northern District of California

1   some point, the two had a dispute. Id. at 71:21-72:17. After the dispute, Ms. Chang tried to ignore

2   Wade. Martin Decl. at ¶10; Wade Depo. at 72. Ultimately, this dispute culminated in an altercation

3   wherein Wade admittedly told Ms. Chang "Just don't say a God damned thing to me again." Brown

4   Decl at ¶10, Ex I at 2 (interrogatory responses); Wade Depo. at 72. Ms. Chang was distraught after

5   this conversation, and eventually changed her work schedule to avoid being alone in the office with

6   Wade. Martin Decl. at ¶10. Wade received a verbal reprimand for his behavior toward Ms. Chang.

7   Id.

8           3.      Wade's Second Altercation With A Co-Worker And Move To A New Cubicle

9           On or about October 7, 2001, Wade engaged in a second altercation with a female coworker,

10  Linda Smith, an African-American female employed as a GS-12 CO. Wade Depo. at 77:10-79:8.

11  Wade and Ms. Smith were working in the office after hours. Id.; Martin Decl at ¶9. Ms. Smith

12  asked Mr. Wade to be sure that he locked the door after he entered the office. Wade Depo. at 78:19-

13  20 ("E.K., I hope you closed that door behind you."). In response, Mr. Wade requested that Ms.

14  Smith stand up, so he could look her in the face. Id. at 79:4-8; Martin Decl. at ¶9. Mr. Wade then

15  proceeded to use profanity stating, "Linda F--k you with your fat a--." Wade Depo. at 79:6.

16  Following this second altercation, several meetings were held with Mr. Wade and his union

17  representative, Ms. Smith and her union representative, Ms. Martin, and District Director Angel

18  Luevano. Martin Decl. at ¶7. Ms. Smith felt threatened by Wade after the incident. Id. After the

19  altercation, Wade was reassigned to another cubicle. Id. at ¶9. Wade maintains that he was "forced"

20  to sit with his back to other COs as punishment for his altercation with Ms. Smith. However,

21  because of the configuration of all of the cubicle groupings, Mr. Wade, like all other COs, had his

22  back to the center of the new cubicle grouping to which he was assigned. Martin Decl at ¶9; Nelson

23  Decl., Ex. G. However, his fellow employee Richard Gaytan testified that Plaintiff was seated

24  facing north while the other COs faced south. Gaytan Depo. at 45 (Pl. Tab J).[2] Wade received a

25  written notice of reprimand after his altercation with Ms. Smith. Martin Decl. at ¶22, Ex. E.

26  _____

27          [2]      Gaytan's testimony regarding why Plaintiff was seated facing north while the other COs
     faced south is speculative and lacks foundation. However, the fact that Plaintiff was in the only cubicle
28  facing north is not speculative. Gaytan Depo. at 45 (Pl. Tab J). His testimony that Mr. Pursley told him
     that Mr. Gilliland hates veterans is inadmissible hearsay. Id. at 59.

4.      Wade Does Not Receive Promotion to GS-11 On His Anniversary Date

Wade himself acknowledges that grade level promotions are not automatic.  Wade Depo. at 53:15-23.  To be promoted, a CO must meet or exceed his Performance Standards.  Martin Decl. at ¶¶4-5; Smitherman Decl at ¶ 4, Exs. A at 003258 & B at 3; Deposition of Woody Gilliland ("Gilliland Depo."), Ex. C at 15:3-24.  The Performance Standards categories are: Quality, Work Management, and Communication (both oral and written).  These categories are evaluated and considered during any recommendation for promotion.  Martin Decl. at ¶5.  In order to ensure that promotions were consistent among the various regional offices, recommendations for promotions were sent to the Regional Director, who at the time was Woody Gilliland.  Gilliland Depo. at 15:8-18; 17:7-17.  Mr. Gilliland forwarded these recommendations to a review team.  Mr. Gilliland and the review team would then review the employee's performance and the supervisor's recommendation to determine if promotion was appropriate.  Id.

Around the time of Mr. Wade's anniversary date, September 26, 2001, which was the earliest date on which he could have been promoted, there was concern with respect to Wade's communication skills and the quality of his work.  Martin at ¶5.  The communication standard requires that a CO maintain satisfactory working relationships orally and in writing with supervisors, co-workers, Regional Office and National Office personnel, complainants, and contractors.  Wade's supervisor found that Wade performed unsatisfactorily with respect to the Communication standard based on Wade's altercation with his co-worker, Arlene Chang.  Id.  Shortly after Wade's anniversary date, the second altercation with Ms. Smith occurred.  In addition to unsatisfactory performance in the communication standard, Wade had issues with the quality of his written work and analysis and consequently had not demonstrated that he was ready for a promotion by his anniversary date.  Smitherman Decl at ¶5 & Ex. A.[3]

5.      Wade's Grievance Regarding Promotion to GS-11

Dissatisfied with the fact that he did not receive a grade promotion, Wade filed a Step 1

---

[3]  Wade submits evidence of his annual performance evaluations from the April 2001-October 2003 time period, during which his communication was rated satisfactory.  See Pl. Tab B-10.  Those evaluations rate Plaintiff's skills for his current grade level, not for the next grade level to which he would be promoted.  For purposes of this motion, however, the Court considers that Plaintiff met the communication standard for his current grade level for annual review purposes during that time period.

United States District Court
For the Northern District of California

grievance with his union on or about November 27, 2001.  Martin Decl at ¶20.  On or about January 25, 2002, Wade met with Ms. Martin, Mr. Luevano and his union representative, Cindi Adams, to address his Step 1 grievance.  Id.  Wade was informed that his work product was unsatisfactory and his communication skills were a concern due to the two altercations with co-workers.  Id. at Ex. C at 003222-23.  The grievance was resolved at the initial stage by an agreement to evaluate Wade's performance and behavior towards his co-workers after he completed the complaint investigation that was assigned to him on November 5, 2001.  Id. at Ex. D at 003234-35.

        6.      Wade Admits Management Did Not Retaliate Against Him For "Whistle Blowing"

During that January 25, 2002, meeting, Wade admitted that management had not retaliated against him for reporting receipt of an inappropriate email from a co-worker.  Martin Decl. at ¶ 3 & Ex. C at 003222.  In July 2001, Mr. Wade informed Ms. Martin that he had received an email from a co-worker, CO Jesus Alvarez, that Wade found offensive.  Id. at ¶3.  After receiving Wade's report, Ms. Martin met with Angel Luevano (her supervisor); they decided to investigate Wade's claim.  Id.  After the investigation, Mr. Alvarez apologized for his action and received a written reprimand.  Id.  Additionally, management sent an email to all employees advising them that it was inappropriate to send racially and sexually offensive emails in the workplace.  Id.  There were no disciplinary or other personnel actions taken against Mr. Wade for his report of Mr. Alvarez's conduct.  Id.  At the Step 1 meeting, Wade stated that he "felt that the [email incident] was not an issue anymore and wanted to move on."  Id. at Ex. C.

        7.      Wade Travels To Reno, Nevada

On or about January 4, 2002, Wade traveled to Reno, Nevada, to conduct a compliance check.  Wade believes that Ms. Martin sent him on this assignment in retaliation for filing a complaint and because of his disability.  Wade Depo. 97:16-98:4.  However, the undisputed evidence shows that Ms. Martin was on leave during Wade's travel to Reno and did not learn of the trip until her return.  Martin Depo. at 14:17-16:7.  Mr. Luevano was also on leave.  Id.  Ms. Martin only learned of Wade's trip after speaking with the government contractor who had been the subject of Wade's compliance check.  Id.  Wade did not discuss the scheduling of this trip with Ms. Martin prior to her departure on annual leave, and Ms. Martin did not authorize Wade's trip.  Id.

**United States District Court**
For the Northern District of California

8.     Wade Is Promoted to GS-11

Wade completed the on-site portion of his complaint investigation on or about April 1, 2002. On April 3, 2002, Ms. Martin submitted her recommendation for Wade's promotion to GS-11. Martin Decl at ¶7 & 21, Ex. D at 003234.  Ms. Martin then went on leave for approximately two months for medical reasons.  Because of his altercation with Ms. Smith, approval of his promotion was delayed until further review of his communication performance could be performed.  Id., Ex. D at 003234.  Ms. Martin was not the ultimate decision maker regarding Wade's promotion, and her recommendation only initiated the evaluation process. Gilliland Decl. at ¶2.  The recommendation for Wade's promotion was forwarded to Regional Director Woody Gilliland for final approval. Gilliland Depo at 15:8-18.  Due to Wade's communication problems, i.e., the use of profanity and menacing behavior toward co-workers, Wade's promotion was delayed pending further review. Wade was later promoted to GS-11 in July 2002.  Martin Decl., Ex. D.

9.     No National Budget For Off-Site Training

Beginning in September 2001, the National Office informed the Regional offices that there was no longer money in the budget for off-site training for COs.  See, e.g., Smitherman Decl. at ¶6. This meant that the Oakland office, along with all other OFCCP offices, were no longer able to send COs off-site to regional training sessions.  These training sessions were usually held in various parts of the country and involved significant travel and lodging expense. Id.  Wade refers to this in his testimony as "formal" training.  Wade Depo. at 110:11-14.

10.     Wade Is Found Not Qualified for the GS-12 Position On His Anniversary Date

In July 2003, when Wade completed the minimum one-year waiting period to become eligible for promotion to the position of GS-12, management determined that he had not demonstrated the ability to perform at the level of complexity required for that position; accordingly, he was not promoted.  Smitherman Decl at ¶5.  Wade showed significant weakness in his ability to work independently and to analyze evidence gathered during an investigation to reach a conclusion. Martin Decl at ¶16.  On or about August 1, 2003, Ms. Martin met with Wade to discuss his performance and areas for improvement.  Wade Depo. at 103:6-18; Martin Decl. at ¶16.

United States District Court
For the Northern District of California

11.    Wade Requests Advanced Sick Leave

On or about February 22, 2004, Wade began sick leave and remained out on sick leave until April 22, 2004.  Wade Depo. at 135:17.  On March 24, 2004, Wade requested eighty hours of advanced sick leave.  In response to Wade's request, Mr. Gilliland asked that Wade provide a statement of diagnosis and prognosis, as was his practice with requests of this type.  Gilliland Decl. at ¶4.  On April 1, 2004, Wade submitted a medical statement that did not provide sufficient information to make a decision regarding his request for advanced sick leave.  Id. at ¶¶ 4 & 11.  Accordingly, on April 5, 2001, Mr. Gilliland sent Wade a letter to submit to his doctor to obtain a complete medical statement.  Id. at ¶12, Ex. E.  On April 6, 2004, Wade provided a letter from Stephen Heckman, M.D a Clinical Psychologist.  Id. at ¶ 13, Ex. F.  That letter was fairly detailed, diagnosing Wade with adjustment disorder with mixed anxiety and depressed mood.  Dr. Heckman concluded that when Wade was able to return to work on April 22, 2004, he would not be able to work in his current module, but would be able to return to a different module.  This conclusion was based on Wade's description of his "interpersonal stressors" in his module, which related largely to his denial of his promotion, his receipt of email messages with vulgar sexual and racist content, and being the victim of retaliation by his supervisor, Ms. Martin.  Id.  The information in Dr. Heckman's letter was deemed inadequate because it did not describe Wade's current working situation, as his supervisor Ms. Martin had retired, and several questions regarding the extent of Wade's illness and his ability to return to work and perform the essential functions of his position remained unanswered.  On April 15, 2004, Mr. Gilliland sent Wade a letter detailing his concerns about Wade's request, noting numerous follow-up questions for Wade and his doctor.  However, Mr. Gilliland granted Wade's request for 80 hours of advanced sick leave, with the admonition that any further requests would require more "scrutiny." Id. at ¶14, Ex. G.

On May 3, 2004, Wade made a request for an additional 160 hours of advanced sick leave.  Gilliland Decl at ¶¶5& 15, Ex. H.  Wade relied on the same letter from Dr. Heckman dated April 6, 2004, to support his request.  Id.; Wade Depo at 137:2-6.  Pursuant to Dr. Heckman's letter, however, Wade was to return to work on April 22, 2004.  Gilliland Decl at ¶13, Ex. F.  Wade's request for the additional 160 hours was denied.  Wade Depo at 136:19-137:1; Gilliland Decl at ¶5.

8

1   Wade does not claim that his request for advanced sick leave was a request for a reasonable

2   accommodation for his PTSD.  Wade Depo. at 133:9-13.

3              12.      Wade Requests A Transfer To A Different Module

4          In addition to his request for advanced sick leave, in April 2004, Wade requested a transfer

5   from his supervisor Ms. Martin's module to Albert Rocha's module.  Wade characterizes this

6   request as his third request for "reasonable accommodation" of his PTSD.  The letter from Dr.

7   Heckman, submitted in support of this request, does not mention a PTSD diagnosis, but rather states

8   that Wade suffers from " Adjustment Disorder with mixed Anxiety and Depressed Mood."  Gilliland

9   Decl at ¶¶5 & 13, Ex. F.  As noted above, Dr. Heckman's letter indicated that Wade's supervisor

10  Ms. Martin was the primary reason the transfer was needed, although the letter also referenced other

11  stressors in Plaintiff's module, namely the offensive emails sent to him by his co-workers and the

12  resulting retaliation.  Id.  However, even if Wade were to have transferred modules, he would still sit

13  in the same area with his former co-workers, as the modules share the same office space.  See

14  Nelson Decl., Ex. G.  When Defendant received Dr. Heckman's letter, Ms. Martin had retired from

15  the office and a new supervisor was in place.  Wade's request to transfer modules was denied.

16  Gilliland Decl at ¶4.

17         Wade claims that he made other requests to transfer modules, which he now alleges were

18  requests for accommodation.  Wade Depo. at 153:13-154:6.  It is unclear when he made the first

19  request, because Wade has offered conflicting testimony, but it was made to Angel Luevano either

20  in November 2001 or August 2002 or November 2002.  Wade Depo. 175:2-5; 159:2-9; Opp. at 2.

21  Wade requested to transfer because he was not getting training from Ms. Martin.  Luevano Depo. at

22  17, Pl. Ex. D.  Wade testified that he made the second request to Mr. Smitherman on August 1,

23  2003.  Wade Depo. at 151:17-21; Opp. at 3.  Wade admitted that, with respect to his request to Mr.

24  Smitherman, he only said "Help me get away from this woman" and he did not say that his request

25  had anything to do with a disability.  Id at 153:13-154:6.  Mr. Smitherman did not interpret this

26  statement to be a request for reasonable accommodation and denied it because he had not allowed

27  any other transfers based on dislike of one's supervisor.  Smitherman Decl at ¶7.  Wade also testified

28  that he made a transfer request to Alice Young.  Wade Depo at 148:6-150:1.  However, he has not

United States District Court
For the Northern District of California

1   presented evidence of the details of this request, including any medical documentation that may have

2   supported it.

3                  13.     Wade Engages In Third Altercation With Co-Workers

4           In September 2004, shortly after Wade returned to work from sick leave, he had a third

5   altercation with two female co-workers, Kathyann Batiste and Berlene Roberts.  Wade Depo. at 201;

6   Batiste Depo. at 32:18-24.  By this time, Wade had filed an EEO complaint and sent several COs

7   interrogatories.  Ms. Batiste and Ms. Roberts chose not to complete the interrogatories and informed

8   Wade of their decision in a conference room in the Oakland office.  Batiste Depo at 32:18-24.  Wade

9   became irate, raised his voice, and used a racial epithet stating:  "Negroes that's what I'm dealing

10  with here, Negroes."  Wade Depo. at 201:21-23; Batiste Depo. at 32:18-24.  Wade's voice could be

11  heard down the hallway.  Alvarez Depo. at 37:3-15.  Ms. Batiste and Ms. Roberts, both of whom are

12  African-American, were upset by Wade's behavior and reported his conduct to their then supervisor,

13  Sarah Nelson.  Ms. Batiste expressed concern for her safety as a result of Wade's unpredictable

14  behavior.  Nelson Decl. at ¶¶3 &6, Exs. B & C.  Wade and several other employees were

15  interviewed about this incident.  Id., Ex. C.

16                 14.     Defendant Issues A Notice Of Suspension And Wade Resigns

17          On October 7, 2004, as a result of this third verbal altercation, Defendant issued Wade a

18  Notice of Proposed Suspension for 14 days.  Nelson Decl. at ¶¶ 3 & 9, Ex. E.  Four days later, Wade

19  submitted his written resignation to the Defendant.  Nelson Decl., Ex. F.  On or about October 12,

20  2004, Wade left a voice mail message for Charles James, Deputy Assistant Secretary for OFCCP,

21  stating that " . . . you need to call me back as soon as you possibly can - it might save lives."  FAC at

22  ¶ 22.  As a result of Wade's message, Federal Protective Services was notified, Wade's picture was

23  posted at the entrance of the DOL office, and he was removed from service.  Smitherman Decl at ¶8.

24  Wade pursued his claims alleging employment discrimination before the EEOC and Merit Systems

25  Protection Board ("MSPB"), but they were dismissed.

26  **II.     LEGAL STANDARD**

27          Summary judgment shall be granted if "the pleadings, depositions, answers to

28  interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

United States District Court
For the Northern District of California

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c). Material facts are those which may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court must view the facts in the light most favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn from those facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. Id. If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. See Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 250.

III.    **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

A.    Statute of Limitations

Wade claims that Defendants disparately discriminated against him based upon his race, disability and age by being: 1) "forced" to move to another cubicle; 2) denied a timely promotion to GS-11 in retaliation for whistle blowing; 3) denied "formal" off-site systemic discrimination training; 4) denied a request to transfer from one module to another module; 5) sent to Reno, Nevada in retaliation for filing a union grievance; 6) denied promotion to GS-12; 7) denied a request 160 hours of advanced sick leave; and 8) denied workers' compensation benefits.[4]

---

[4]    This court lacks subject matter jurisdiction to review denials of workers' compensation claims. The Federal Employees Compensation Act ("FECA") 5.U.S.C. § 8101 et seq. prevents the district court from reviewing worker's compensation determinations made by the Secretary of Labor. See 5 U.S.C. § 8128(b)(2) (expressly prohibiting review of Workers' Compensation determinations by district court).

United States District Court
For the Northern District of California

1    Pursuant to 29 C.F.R. § 1614.105(a)(1), an aggrieved person must initiate contact with an

2    EEO counselor within 45 days of the date of the matter alleged to be discriminatory.  Although

3    Wade filed various EEO complaints during his tenure at the OFCCP, many of claims based upon the

4    adverse actions listed above are time barred due to failure to make timely EEOC contact.  Here,

5    Wade did not file his first EEO complaint until August 14, 2003.  Brown Decl at ¶9, Ex. H.

6    Therefore, the EEOC denied his complaints regarding his delayed promotion and his cubicle move

7    as untimely.  Id.  Wade himself testified that the claims in his first EEO complaint were dismissed

8    due to his failure to comply with the statute of limitations.  Wade Depo. at 176:5-17.

9    The time period for filing a complaint begins to run when facts that would support the claim

10   for discrimination are apparent to the plaintiff.  Cherosky v. Henderson, 330 F.3d 1243, 1246 (9th

11   Cir. 2003) ("claims based on discrete acts are only timely where such acts occurred within the

12   limitations period, and that claims based on a hostile environment are only timely where at least one

13   act occurred during the limitations period").  Accordingly, Wade's claims related to his allegedly

14   delayed promotion to GS-11 are barred because Wade claims that he should have been promoted on

15   September 26, 2001.  Wade argues that he should be excused from the EEO filing requirements

16   because his union failed to arbitrate.  Wade filed grievances, and the Defendant issued its final

17   decision in response to Wade's step-2 grievance on January 21, 2003.  Gilliland Decl. ¶ 8, Ex. A.

18   Wade had thirty days to appeal.  29 C.F.R. §§ 1614.401(d), 1614.402.  Wade had until March 22,

19   2003 to invoke arbitration.  Gilliland Decl., Ex. A.  The union did not invoke arbitration.  Itelson

20   Decl. at ¶ 2.  Wade, however, did not contact the EEO on these claims until August 14, 2003.  Even

21   assuming, therefore, that his time to file his EEO complaint started running as late as March 22,

22   2003, Wade has not offered facts to support tolling to August 14, 2003.[5]

23   Similarly, Wade's claim that he was forced to move to a different cubicle because of his race

24   and disability is time-barred because that took place in October 2001.  Wade's claim for denial of

25

26        [5]   Wade relies on Sidhu v. Flecto Co., 279 F.3d 896 (9th Cir. 2002) (addressing the legal
27   question of whether an employee is required to exhaust remedies under the collective bargaining
     agreement prior to suing in federal court) to argue that his failure to exhaust should be excused, but this
28   case is inapposite.  In Sidhu, the employer, after repudiating arbitration, asserted that the employee's
     claim was barred because he failed to exhaust the grievance procedures.  The employee was excused
     from the exhaustion requirement based on the employer's repudiation of the grievance procedures.

**United States District Court**
For the Northern District of California

1  accommodation based on his request made to Luevano in November 2001 and November 2002 are

2  also barred.  Further, Wade's claim for retaliation based upon his trip to Reno, Nevada is time-

3  barred because that trip occurred on January 4, 2002.  Accordingly, summary judgment is granted as

4  to claims based on these alleged adverse actions.  Even if these claims were timely, however,

5  summary judgment would be proper on the merits for the reasons discussed below.

6        B.     Disparate Treatment Claim

7       In his first claim, Wade alleges that he experienced disparate treatment on the basis of race,

8  age, and disability.  Wade relies on the adverse acts set forth above in section I.C.  Wade's disparate

9  treatment claim fails because (1) for many of his claims, he cannot establish a prima facie case, and

10  (2) for all of his claims, he cannot raise a triable issue of fact that the legitimate non-discriminatory

11  explanations offered by Defendant are pretext.

12       Wade has offered no direct evidence of discrimination, and his case rests on circumstantial

13  evidence of discrimination.  To prevail on a disparate treatment claim, Wade must satisfy the test set

14  forth by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  Wade first

15  must establish a prima facie case of discrimination.  To do so, a plaintiff must show that (1) he

16  belongs to a class of persons protected by Title VII or the ADEA; (2) he performed his job

17  satisfactorily; (3) he suffered an adverse employment action; and (4) his employer treated him

18  differently than a similarly situated employee who does not belong to the same protected class as

19  plaintiff.  <u>Cornwell v. Electra Cent. Credit Union</u>, 439 F.3d 1018, 1028 (9th Cir. 2006).  A "plaintiff

20  must carry the initial burden of offering evidence adequate to create an inference that an

21  employment decision was based on a discriminatory criterion illegal under the [antidiscrimination

22  statutes]."  <u>Fong v. American Airlines</u>, 626 F.2d 759, 762 (9th Cir. 1980).

23       If the plaintiff establishes a prima facie case, "the burden of production shifts to the

24  employer to articulate a legitimate, nondiscriminatory reason for the employment decision."  <u>Leong</u>

25  <u>v. Potter</u>, 347 F.3d 1117, 1124 (9th Cir. 2003).  If the employer offers "a nondiscriminatory reason,

26  the burden returns to the plaintiff to show that the articulated reason is a pretext for discrimination."

27  <u>Id</u>. (citation omitted).

28            1.     Prima Facie Case of Disparate Treatment

13

United States District Court
For the Northern District of California

1    Defendant argues that Wade cannot state a prima facie case of race, disability, or age

2    discrimination because he cannot establish the fourth prong of the prima facie case, which requires

3    that Wade show that any "similarly situated" persons outside of his protected classes (African

4    American, over 40, with disability) "were treated more favorably." Leong, 347 F.3d at 1124

5    (citation omitted). A plaintiff must show that others outside of his protected class had "similar jobs

6    and displayed similar conduct," yet were treated differently. Vasquez v. County of Los Angeles,

7    349 F.3d 634, 641 (9th Cir. 2003).

8    Wade has not provided evidence that similarly-situated individuals outside of his protected

9    class were treated more favorably than he was treated. There were thirteen COs when Wade joined

10   the Oakland office. Smitherman Decl. at ¶3. None of the COs employed in the Oakland office were

11   GS-9 when Wade began working. With the exception of two, all had reached the GS-12 level prior

12   to Wade's arrival, and the remaining two had reached the GS-11 level by his arrival. Id. Employees

13   of different seniority levels with differing responsibilities are not similarly situated. See Vasquez,

14   349 F.3d at 641 ("Employees in supervisory positions are generally deemed not to be similarly

15   situated to lower level employees."). Wade has not met his burden of raising a triable issue of fact

16   that the other COs were similarly situated.

17   Even assuming that the more senior COs were similarly situated, Wade cannot show

18   disparate treatment regarding the allegedly "untimely" merit-pay promotions. Apparently, there

19   were several other COs outside of Wade's protected classes (Jesus Alvarez, George Miner, and Don

20   Frey), who did not receive merit-pay promotions on their anniversary dates. Smitherman Decl. at ¶¶

21   18-20; Martin Decl. at ¶8. Wade describes Miner as younger, white, and disabled; Alvarez as

22   younger, Hispanic, and non-disabled; and Frey as younger and non-disabled. Opp. at 14, 17. The

23   fact that others outside of Wade's protected classes were treated similarly defeats the presumption of

24   discrimination. Snead v. Metropolitan Prop. & Cas. Ins. Co., 237 F.3d 1080, 1094 (9th Cir. 2001)

25   (affirming summary judgment in disability discrimination case where similarly-situated employee

26   was treated the same as plaintiff).

27   As to systemic discrimination training, Wade admits that the only training he was allegedly

28   denied is systemic discrimination training. Wade Depo. at 109:25-110:2. Wade, however, admits

14

**United States District Court**
For the Northern District of California

1  that he received the on-site systemic discrimination training that was offered during his tenure.

2  Wade Depo at 116:7-14.  In his opposition, Wade relies on <u>Patel v. Allstate Ins. Co.</u>, 105 F.3d 365

3  (7th Cir. 1997) to argue that he need only prove that any training Defendant failed to provide him

4  was material to his further promotion.  However, the <u>Patel</u> court stated that a plaintiff must show he

5  was not provided training under circumstances giving rise to an inference of discrimination.  <u>Id</u>. at

6  371 (affirming summary judgment in favor of employer); <u>see also Shah v. Mt. Zion Hosp. & Med.</u>

7  <u>Ctr.</u>, 642 F.2d 268, 271 (9th Cir. 1981).  Wade has not met this burden.  He alleges that numerous

8  individuals received such training.  Opp. at 14.  However, he has not identified any evidence to

9  support his claim that persons outside of his protected class received off-site systemic discrimination

10  training.  Apparently, none of these COs received such training after budget cuts in September 2001.

11  Smitherman Decl. ¶ 6; Martin Decl. ¶ 15; Wade Depo. at 122.  Mr. Luevano testified that due to

12  budgetary constraints, Defendant initially limited number of COs who could attend training, then

13  limited it to GS-12 level COs.  Luevano Depo. at 63-65 (Pl. Tab D).  In fact, he specifically stated

14  that Wade was not put on a list for training because he was not the requisite GS level.  <u>Id.</u> at 59.

15      Here, Mr. Rocha is the only person that Wade identified as having received "formal"

16  systemic discrimination training during his tenure.  <u>Id</u>. at 122:20-24.  However, Mr. Rocha was an

17  Assistant District Director for much of Wade's tenure, and Wade does not state that Mr. Rocha was

18  a similarly situated CO when he received this training.  Mr. Rocha himself testified that budgetary

19  concerns limited persons who received off-site training, and that this affected Wade "and others."

20  Rocha Depo. at 14, 67 (Pl. Tab C-1).  Mr. Rocha also testified that Wade attended a training with

21  him in San Diego.  <u>Id</u>. at 17.  None of this testimony indicates discrimination.  While Richard

22  Gaytan testified that he and Wade were denied off site systemic discrimination training while other

23  COs that were younger and without disabilities received such training, he did not identify who

24  received what training and when.  Gaytan Depo. at 22 (Pl. Tab J); <u>see also</u> Alvarez Depo. at 15 (Pl.

25  Tab B) (testifying that systemic discrimination training was available to all COs without specifying

26  time period).

27      As to denial of sick leave, Wade points to the fact that Mr. Gaytan, a Hispanic CO, was

28  granted sick leave to support his claim that he was denied advanced sick leave on the basis of race.

United States District Court
For the Northern District of California

1    However, Wade has not proffered evidence that Gaytan, like Wade, failed to provide sufficient

2    medical documentation to support his request.  See Gilliland Decl at ¶6; Gaytan Depo. at 55-56 (Pl.

3    Tab J).

4         Wade also claims that he was denied transfer from modules based upon race.  Wade Depo at

5    151:9-15.  Wade points to the fact that two female COs were allowed to transfer to Ms. Martin's

6    module.  Wade Depo at 143:12-14.  The COs identified by Wade are Berlene Roberts and Kathyann

7    Batiste.  Both are African American and cannot support a prima facie case based upon race.  In

8    addition, there is no evidence showing that they were similarly situated; rather, they were more

9    senior than Wade.  Finally, as to mentoring, it is undisputed that Wade was assigned a formal mentor

10   by Defendant.  Martin Decl. ¶ 15.

11              2.    Legitimate Non-Discriminatory Reasons and Pretext

12        The crux of Wade's case is that Defendant was improperly motivated by Wade's race, age,

13   and disability when it made certain adverse employment decisions affecting Wade.  Although some

14   of the elements to state a prima facie claim regarding Wade's claims for disparate treatment,

15   retaliation, hostile work environment and constructive discharge differ, all of these claims require

16   that, should Defendant establishes a legitimate non-discriminatory reason for its decisions, Wade

17   raise a triable issue of fact that Defendant's reason is pretextual.  Vasquez, 349 F.3d at 647.

18        Once a defendant articulates a legitimate, non-discriminatory reason for its actions, any

19   presumption of unlawful discrimination drops out of the case, and plaintiff must raise an issue of

20   fact that the employer's articulated reasons are pretext for discrimination articulated reason is a

21   pretext for unlawful discrimination by "either directly persuading the court that a discriminatory

22   reason more likely motivated the employer or indirectly by showing that the employer's proffered

23   explanation is unworthy of credence."  Aragon v. Republic Silver State Disp., Inc., 292 F.3d 654,

24   658-59 (9th Cir. 2002) (internal citations and quotations omitted).  Although the presumption of

25   discrimination is gone once the defendant meets its burden of production, the trier of fact may still

26   consider the evidence establishing the plaintiff's prima facie case and inferences drawn therefrom in

27   considering whether defendant's explanation is pretextual.  Reeves v. Sanderson Plumbing Prods.,

28   530 U.S. 133, 143 (2000).  To survive summary judgment when relying on circumstantial evidence,

as Wade does, a plaintiff must provide both specific and substantial evidence to demonstrate such pretext.  Aragon, 292 F.3d at 659 (citations omitted).  A "plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  Reeves, 530 U.S. at 148.

Defendant has established legitimate non-discriminatory reasons for each of its decisions.  Wade has not shown any "specific and substantial" evidence to show discriminatory motive by his supervisors that could support a finding of pretext.  Wade does not point to any discriminatory statements made by his supervisors related to race, age, or disability.  Wade's only evidence of pretext is his belief that because he is an African American man with a disability, his supervisors discriminated against him; this is not sufficient to establish pretext.  See e.g., Wade Depo at 161:19-162:8.  Defendant's nondiscriminatory reasons for each employment action are documented and unrebutted.

As to moving Wade to a different cubicle, Wade was moved after engaging in two separate verbal altercations with his co-workers in which he used profanity and engaged in menacing behavior.  Wade has no evidence to show that the move was motivated by discriminatory animus or that Defendant's proffered reason is pretextual.  Simply being a member of protected class does not prohibit an employer from disciplining an employee for improper behavior.  Cf. Fong, 626 F.2d at 762 ("Taking reusable property from the airline premises is punished when detected, also without regard to race.").

As to Wade's complaints of untimely promotions, Wade complains that the "untimely" merit-pay promotions to GS-11 and failure to promote him to GS-12 were adverse actions.  In order to state a claim for failure to promote, a plaintiff must be able to show that he was qualified for the position.  See, e.g., Morita v. Southern Cal. Permanente Med. Grp., 541 F.2d 217, 219 (9th Cir. 1976).  Wade claims that his promotions to GS-11 and GS-12 were untimely because they did not occur on the completion of the one-year waiting period.  However, it is undisputed that promotions are not automatic and that communication is a factor in evaluating a candidate for promotion.  Martin Decl. at ¶¶4-5; Wade Depo at 53:15-23; 104:11-14.  An employee must demonstrate readiness for a promotion and an ability to perform at the next level.  Smitherman Decl at ¶4.

17

**United States District Court**
For the Northern District of California

1    Defendant has demonstrated it had a legitimate, non-discriminatory reason for not promoting

2    Wade, as Wade was not qualified for the GS-11 position on his first anniversary date.  Wade

3    concedes that Ms. Martin was not motivated by race or age with respect to her assignment of

4    Complaint Investigations.  Wade Depo. at 90:18-25.  Wade only contends that she treated him

5    differently due to his disability.  Id. at 86.  Wade claims that if he had received a "Complaint

6    Investigation" in a timely manner, he would have been eligible for promotion on his anniversary

7    date.  Wade Depo. at 85:20-86:3. Wade, however, took approximately six months to complete the

8    first Complaint Investigation he was assigned.  Further, Wade did not demonstrate communication

9    skills that were at a level to merit a promotion.  Wade's altercations with his coworkers Ms. Chang

10   and Ms. Smith evinced his failure to meet this standard, and this was discussed at his Step 1

11   meeting.  Martin Decl at ¶ 20, Ex. C.  By his anniversary date, Wade had not demonstrated the

12   ability to perform at the next level.  Once Wade demonstrated an ability to perform at the GS-11

13   level, he was promoted.

14   Wade argues that Defendant's proffered reason for the alleged delay is pretextual because the

15   April 3, 2002 recommendation for his promotion was not date stamped, showing that his promotion

16   was never processed.  Opp. at 19.  Defendant has demonstrated, however, that Wade's promotion

17   took place in July rather than April, 2002 because his communication skills needed further

18   evaluation.  Martin Decl., Ex. D.  While Mr. Luevano testified that he believed the request for

19   promotion was received by Mr. Gilliland in April and that management delayed processing Wade's

20   paperwork, Wade has not rebutted the *reasons* for this delay, i.e., the need to evaluate Wade's

21   communication skills.  Luevano Depo. at 39, Pl. Ex. D.  In addition, Defendant properly objected to

22   Mr. Luevano's conclusion that management did not want to promote Mr. Wade and had no business

23   reason to hold up his timely promotion as speculative and lacking foundation.  Id. at 55-56.

24   Defendant did not promote Wade to the GS-12 level because the quality of his work was not

25   sufficient for a GS-12 level employee.  In July 2003, when Wade met the one-year waiting period to

26   become eligible for promotion to GS-12, he had not demonstrated the ability to perform at the level

27   of complexity required for a GS-12 Compliance Officer.  Smitherman Decl at ¶5. Wade showed

28   significant weakness in his ability to work independently and to apply analytical skills to reach

United States District Court
For the Northern District of California

1  conclusions.  In August 2003, Wade's supervisor met with him to discuss his performance and

2  writing skills necessary to reach GS-12.  Wade Depo at 103:6-18; Martin Decl at ¶16.  Finally,

3  Wade was not the only CO not to receive promotion to GS-12 on his or her anniversary date.

4  Neither George Miner, Don Frey, nor Jesus Alvarez, who Wade lists as comparators, were promoted

5  to GS-12 on their anniversary dates.  Smitherman Decl at ¶¶18-20.  Also, it is undisputed that

6  Defendant met with Wade to assist him in developing the skills to achieve his promotion, which

7  undercuts a claim of discriminatory animus.

8          Wade cites a draft memorandum prepared by Ms. Martin to show that he was denied

9  promotion to GS-12 on the basis of race, disability, or age.  Ms. Martin's draft memorandum, dated

10  December 2, 2003, states that Wade met the standards for promotion.  Pl. Tab C, Ex. 16.  Wade,

11  however, has not established that Ms. Martin failed to process the memorandum.  Ms. Martin does

12  not know if the memorandum was received by Messrs. Smitherman or Gilliland.  Martin Depo. at

13  47-48.  In any event, Wade has offered no evidence showing that any alleged failure to process his

14  promotion was motivated by discriminatory animus, and such a claim is belied by the fact that Ms.

15  Martin participated in providing Wade with feedback and training to help him become promoted.

16          As to Wade's trip to Reno, Wade claims that his immediate supervisor, Ms. Martin, sent him

17  on a "demeaning" compliance check trip to Reno, Nevada in retaliation for his Step 1 grievance.

18  Opp. at 2.  Ms. Martin, however, testified that she did not authorize Wade's travel to Reno because

19  she was on leave at the time, and there is no evidence to the contrary.  Even assuming a dispute of

20  fact, however, Reno was a part of the region served by the Oakland office and a proper place to send

21  a CO on assignment.

22          As to systemic discrimination training, Wade admits that he received systemic discrimination

23  training, but claims it was not "formal" because it was not off-site.  Wade Depo. at 110:2-10.  Wade

24  claims that he was discriminated against because he did not travel to systemic discrimination

25  training.  As discussed above, however, Defendant did not have the budget to send any COs away

26  for off-site training after 2001.  Martin Decl. at ¶15; Smitherman Decl. at ¶6. This is a legitimate

27  non-discriminatory reason for not sending Wade off-site for training.  Wade has not offered specific

28  and substantial evidence showing that this reason was pretextual.

**United States District Court**
For the Northern District of California

1    As to advanced sick leave, Wade claims that he was denied 160 hours of advanced sick leave

2  because of his race.  However, Wade did not provide adequate medical documentation to support his

3  request.  Gilliland Decl. at ¶5.  An employer may obtain medical documentation before granting or

4  denying a request.  Wade relied on Dr. Heckman's April 6, 2004 letter to support his May 3, 2004

5  request, but that letter listed Wade's return date to work as April 22, 2004.  Wade Depo. at 137:2-6.

6  Wade failed to provide updated information, even though his supervisor informed him that any

7  requests for additional sick leave would be subjected to more scrutiny.  Defendant reasonably

8  exercised managerial discretion to deny Wade's request.  While Wade claims that Richard Gaytan

9  was granted advanced sick leave, he does not identify any evidence regarding the documentation

10  that Gaytan submitted in support of his request.  Gaytan Depo. at 55-56, Pl. Ex. J; Gilliland Decl. at

11  ¶ 6.  In his opposition, Wade also identifies a policy that he claims supports his position that he was

12  entitled to additional sick leave irrespective of his medical documentation.  But this policy, which is

13  not fully described in Wade's opposition, states "upon request *and the presentation of a medical*

14  *certificate*, sick leave should normally be advanced . . . ."  Opp. at 18 (emphasis added).

15    As to the denial of Wade's transfer request, Wade has not shown any discriminatory motive

16  regarding the denial of his requests to transfer modules.  Wade had an established history of

17  dissatisfaction with his supervisor Ms. Martin.  Based upon that history, management did not

18  interpret Wade's first requests to transfer modules as requests for accommodation of PTSD.  Given

19  the fact that Wade did not connect his request to transfer with his disability, management's

20  interpretation was reasonable.  With respect to Wade's third request to transfer, his letter from Dr.

21  Heckman to Mr. Gilliland pointed to Ms. Martin as a main reason that Wade should be transferred,

22  but Ms. Martin had retired by the time of this request.  Accordingly, Defendant was justified in

23  denying Wade's third request to transfer modules because Ms. Martin had retired and Wade was

24  assigned a new supervisor upon his return to the office.  Gilliland Decl. at ¶¶ 4&13 & Ex. F.  In

25  addition, while Wade claims he was disparately treated because Defendant did not process the

26  required paperwork when he requested transfer (Opp. at 21-22), Wade has not provided evidence

27  that he submitted a written request or that Defendant applied an existing policy regarding

28  accommodation in a discriminatory manner.

United States District Court
For the Northern District of California

1    As to Wade's notice of suspension, Defendant had a legitimate non-discriminatory reason for

2  issuing the 14-Day Notice of Suspension to Wade.  In early September, Wade admittedly raised his

3  voice, and used a racial slur toward two of his female co-workers.  Wade Depo. at 201:3-6.  The

4  female co-workers complained to their supervisor and expressed fear for their safety.  As a result,

5  Wade was issued a Notice of Suspension.  Wade's punishment was consistent with the Defendant's

6  policy regarding use of profanity.  This was Wade's third such incident.  Therefore, Wade has not

7  raised a material dispute that the reasons behind his suspension were pretext for discrimination.  The

8  evidence demonstrates that the Defendant had legitimate non-discriminatory reasons for each

9  alleged adverse action.  Plaintiff, in turn, has not raised a triable issue of fact as to pretext.

10    C.    Retaliation

11    To prove a claim of retaliation under Title VII, a plaintiff must show that: (1) he engaged in a

12  protected activity; (2) an adverse action was taken against him; and (3) a causal link existed between

13  the protected activity and the adverse action.  Freitag v. Ayers, 468 F.3d 528, 541 (9th Cir. 2006).

14  In establishing a causal link, a plaintiff must show that the alleged discriminator had knowledge of

15  the protected activity.  Cohen v. Fred Meyer, Inc., 686 F.2d 796, 796 (9th Cir. 1982).  If a plaintiff

16  establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-

17  retaliatory reason for its decision.  Once an employer does so, the plaintiff bears the burden of

18  proving the reason was merely pretext for a retaliatory motive.  Id.

19    Wade claims that Defendant retaliated against him for sending Congressional Inquiry letters,

20  and letters to VETS and Office of Special Counsel.  See Pl. Tabs Q-T.  Defendant argues that these

21  letters are inadmissible hearsay, but they are admissible insofar as they are submitted to show

22  Defendant's knowledge of Wade's actions.  However, Wade has not provided any evidence to show

23  that any of the Defendants who carried out the specific actions above had knowledge of these

24  activities.  In addition, the letters were submitted after all of the relevant activities, except for the

25  proposed suspension and Wade's termination.  See Pl. Tabs Q (dated 8/1/04); R (dated 8/29/04); S

26  (dated 8/29/04); T (dated 8/28/04).  Because Wade has failed to raise a triable issue as to the causal

27  link, he has not stated a prima facie case for retaliation.  In addition, he failed to provide evidence

28  rebutting any of Defendant's legitimate non-discriminatory reasons for its actions as discussed

**United States District Court**
For the Northern District of California

1    above.

2           There is, however, evidence in the record that Defendant had knowledge of Mr. Wade's

3    August 2003 EEO complaint.  See, e.g., Martin Depo. (Pl. Tab. C) at 44-45 (Ms. Martin received

4    January 22, 2004 email regarding status of Mr. Wade's EEO complaint).  To the extent Mr. Wade's

5    retaliation complaint is based on Defendant's failure to promote him to GS-12 after he filed his EEO

6    complaint, however, his claim fails on the merits as Plaintiff failed to show pretext as discussed

7    above.

8           D.       Hostile Work Environment and Constructive Discharge

9           These claims fail for an additional reason.  In order to state a claim for hostile work

10    environment a plaintiff must "raise a triable issue of fact as to whether (1) [he] was 'subjected to

11    verbal or physical conduct' because of his race, (2) 'the conduct was unwelcome,' and (3) 'the

12    conduct was sufficiently severe or pervasive to alter the conditions of [plaintiff's] employment and

13    create an abusive work environment.'"  Manatt v. Bank of America, 339 F.3d 792, 798 (9th Cir.

14    2003).  Moreover, "simple teasing," "offhand" comments, and "off-color" jokes are not sufficient to

15    create a hostile work environment.  Id.  Rather, "conduct must be extreme to amount to a change in

16    the terms and conditions of employment."  Kortan v. CYA, 217 F.3d 1104, 1110 (9th Cir. 2000).

17           To support his claims, Wade relies on an same list of adverse actions discussed above and

18    adds allegations that his supervisor Sarah Nelson shoved a piece of paper at him and snapped at him,

19    and that Defendant refused to accept his written notice of resignation for constructive discharge.

20    Opp. at 5.  Wade has not identified any racial, age, or disability related remarks that were made in

21    the office around him, or aimed at him.  As discussed above, the Defendant had well documented

22    legitimate non-discriminatory justification for all of the alleged adverse actions.  The conduct that

23    Wade alleges is neither severe nor pervasive enough to alter the conditions of his employment, so

24    his claims for hostile work environment and constructive discharge fail.  See Manatt, 339 F.3d at

25    804 (stating, "[w]here a plaintiff fails to demonstrate the severe or pervasive harassment necessary

26    to support a hostile work environment claim, it will be impossible for [him] to meet the higher

27    standard of constructive discharge: conditions so intolerable that a reasonable person would leave

28    the job.") (internal citations omitted).

United States District Court
For the Northern District of California

1    ///

2            E.      Reasonable Accommodation

3            Wade alleges that the Defendant failed to provide him with reasonable accommodation for

4    his disability (PTSD).  Wade Depo. at 92:16-18.  To state a failure to accommodate claim under the

5    Rehabilitation Act, Wade must show that he was a qualified individual with a disability.

6    Buckingham v. United States, 998 F. 2d 735, 739-40 (9th Cir. 1993).  A "qualified individual" is an

7    individual with a disability who, with or without reasonable accommodation, can perform the

8    essential functions of the employment position that such individual holds or desires.  29 C.F.R. §

9    1630.2(m).  Wade did not provide documentation showing that he has PTSD to his managers when

10   he sought the transfer.  The medical documentation Wade provided to his managers from Dr.

11   Heckman shows that he suffers from an "Adjustment Disorder," not PTSD.  Gilliland Decl at ¶13,

12   Ex. F.  Wade has submitted other evidence showing that he suffers from PTSD.  See Pl. Tab A at

13   32.[6]  However, Wade has not shown that he provided these materials, dated January 2006, or any

14   other evidence of his PTSD, to Defendant when he requested accommodation.  There is no evidence

15   in the record showing that Wade requested an accommodation due to his PTSD or that his employer

16   recognized his need for an accommodation which Wade could not request because of his disability.

17   Zivkovic v. S. Cal. Edison Co., 302 F.3d 1080, 1089 (9th Cir. Cal. 2002).  Therefore, Defendants

18   were not obligated to engage in the interactive process with Wade to determine the appropriate

19   reasonable accommodation.  Id.

20           Even assuming that Wade is a qualified individual, however, Wade is not entitled to the

21   accommodation of his choice, but rather, one that is reasonable.  Id.  ("An employer is not obligated

22   to provide an employee the accommodation he requests or prefers, the employer need only provide

23   some reasonable accommodation.").  As discussed above, Wade claims he made multiple requests

24   for accommodation.  Aside from Dr. Heckman's letter, there is no evidence to show that Wade

25   _____

26           [6]   During the independent psychiatric examination in this case, Mark Levy, M.D. ("Dr. Levy")
     determined that Wade did not presently suffer from PTSD and that it is unlikely that he suffered from
27   PTSD when he was employed by the Defendant.  Brown Decl. at ¶8, Ex. G (Levy Rpt at 8-9).  Dr. Levy
     also opined that Wade suffers from a personality disorder and has a weakness in analytical skills that
28   would prevent him from performing as GS-12 CO.  Id.  However, in light of the medical report
     submitted by Plaintiff, as discussed above, the Court assumes that Plaintiff has raised a triable issue of
     fact that he suffers from PTSD for purposes of this motion.

1  actually made a request to transfer *because of* his disability.  Wade testified that his request to

2  transfer modules was a request to change supervisors because he felt that he could not work with

3  Ms. Martin.  Wade Depo at 141:20-23.  He claimed that the only acceptable accommodation was

4  transfer to Mr. Rocha's module.  Wade Depo at 142:17-22.  But it is undisputed that when Wade

5  returned to the office in April 2004, his former supervisor Ms. Martin had retired so he had a new

6  supervisor, Alice Young, and later Sarah Nelson.  Smitherman Decl at ¶23.  Wade's medical

7  documentation did not require that Mr. Rocha be his supervisor, but reflected the fact that Ms.

8  Martin was a primary factor in causing Wade stress.  His medical documentation reflects that

9  Wade's co-workers in his module were another stressor, but even had he transferred modules, Wade

10  would still have shared office space with the same co-workers.  Gilliland Decl., Ex. F at 003274.

11  Finally, in his opposition, Wade claims that other employees were allowed to transfer to another

12  module.  Opp. at 21.  However, these employees, as Wade admits, were not disabled, and those

13  module transfers were not accommodations of disabilities.

14         F.      Evidentiary Objections

15        Defendant objected to some of Plaintiff's exhibits.  To the extent these objections were

16  relevant to relevant material factual disputes, the Court has ruled on them as discussed above.

17  Plaintiff also submitted a reply brief in opposition to Defendant's reply brief and an addendum to

18  that brief.  As the Court explained to Plaintiff at the hearing, the Local Rules permit only the filing

19  of an opening brief, an opposition brief, and a reply brief.  Plaintiff is not permitted to file a reply to

20  a reply brief.  Accordingly, the Court strikes those papers.  However, even if the Court were to have

21  considered his improperly filed pleadings, the outcome would remain the same.

22  **IV.    CONCLUSION**

23        In accordance with the foregoing, the Court GRANTS Defendant's motion for summary

24  judgment.

25        **IT IS SO ORDERED.**

26  Dated: May 4, 2009

                                           *Elizabeth D. Laporte*

27                                      ELIZABETH D. LAPORTE
                                    United States Magistrate Judge

28

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28